ABNER SUMMERS *v.* JOHN F. HOWLAND, ROBERT HOWLAND *et al.* and ALFRED BLACKMAN *v.* JOHN F. HOWLAND *et al.*

1. FRAUD. *Evidence of. Contemporaneous transactions.* In questions of fraud evidence is admissible of other contemporaneous transactions of a similar fraudulent nature, for the purpose of showing interest, and especially is this the case where all the transactions are connected and apparently in concert.

2. SAME. *Same.* The fact that one conveyance made at the same time as others to different parties is shown to be fraudulent, will not be conclusive as to others, but this fact, together with other circumstances, may furnish the ground for weighty inference tending in the same direction, and should be looked to in arriving at a conclusion in such a case.

Case cited: Abbott's Dig., Vol. 2, p. 767, § 2098-9, 2100.

FROM RUTHERFORD.

Appeal from the Chancery Court. JOHN P. STEELE, Chancellor.

E. A. KEEBLE for Summers.

RIDLEY & BURTON and LILLARD for White and Howland.

FREEMAN, J., delivered the opinion of the Court.

The bills in this case were filed against J. F. Howland, Robert Howland, Thomas S. Ford *et al.*, to set aside certain conveyances of land made by White and John F. Howland. The only question before us for decision, however, is the validity of a conveyance of about 200 acres of land conveyed by John F. Howland to Ford, and the conveyance of 100 acres to Robert Howland, the son of John F. Howland. The original bills were filed with the purpose of setting aside five different conveyances, made on the same day by B. G. White and John F. Howland, but the Chancellor decreed all to be valid, or at any rate denied relief except as to the two deeds mentioned, and complainants did not appeal. Defendants, John F. Howland, Thomas Ford and Robert Howland, appealed from the decree against them, declaring the deeds made to them void. The correctness of this decree is the question for our decision.

It is proper to remark that the charges in the bill make a case of fraud as against all the five conveyances attacked; that they were part of a general scheme to cover up the property of the conveyors, and hinder and delay their creditors in the collection of their debts.

The deeds were all executed on the same day, at the same place, written by the same draftsman. The testimony as to all conveyances is found in the

record, and it would be next to impossible, if we were to attempt it, to separate the testimony bearing on one deed, from that bearing on another. We think it proper, in such case, to look at the entire transaction, and in so far as one shall reflect any light upon the motive prompting the other, to get the benefit of such aid in coming at our conclusions.

This principle is thus laid down in several cases in New York: "That upon a question of fraud evidence is admissible of other contemporaneous transactions of a similar fraudulent nature, for the purpose of showing the interest." See Abbott's Dig., Vol. 2, p. 767, § 2098–9, 2100, and cases there cited.

And the principle would be the more applicable where all the transactions were connected, and made apparently in concert. We do not say the fact that one conveyance, made at the same time, as others, to different parties, is or might be shown to be fraudulent, would be conclusive upon the others, but the fact might, in connection with other circumstances, furnish the ground for weighty inferences tending in that direction, and should be looked to in arriving at a conclusion in such a case.

It appears from the pleadings and proof in this record, that B. G. White and John F. Howland had been men of good property and independent circumstances, but at the termination of the war found their property swept away, except their lands, and themselves involved in debt beyond their means to pay. It further appears that John F. Howland was under

apprehenion that the lands of persons sympathizing with the South in the late civil war would probably be confiscated. The debt due to complainant, Summers, was a security debt on the part of Howland, and the principals insolvent, and unable to meet it.

Under these circumstances, on the 5th of August, 1865, Howland and White, by pre-arrangement, met with the other parties to these deeds at the same place, and before they separate all their property is conveyed, and they stripped of the legal title to every thing they possessed. In addition to this it appears that all the parties to these conveyances were more or less related to each other, either by blood or marriage, we believe, except Ford, who was a renter, and notwithstanding his assumed purchase of the 200 acres, continued to rent, rather than occupy his own land.

But, passing from these general considerations, we proceed to refer to some of the circumstances peculiar to the two consequences immediately in question, to-wit: The deed to Ford for the 200 acres of land, and the one to Robert Howland. However, before doing this, a remark of John F. Howland, made to Mr. Lowe a short time after the deeds were made, will serve to point to the motives on his part for the conveyances. Mr. Lowe asked him what was the matter, that he had sold his land, when Howland told him that his liabilities or security debts were such that if he did not do something he would not have land enough to bury him.

This remark, taken in connection with the fact that he had then already disposed of by deeds every acre he owned, is not without its significance, and points to the idea, then no doubt in his mind, that he had in some way, in connection with these conveyances, averted the supposed danger impending.

Take the remark in connection with another fact, that he has ever since actually remained in occupation of his old home, and it would seem very naturally to tend to the conclusion that there was in these swapping conveyances, and underneath them, a secret trust in his favor, by which he would at least secure enough of his considerable landed estate to himself "to bury him in;" in other words, a continued right to the property in some form.

But to return. It appears that Ford was a man with family, owning no land of his own; possessed only of a few horses and other stock. It is clear from the proof that up to this time he was not a married man. It is equally clear that he did not have money to pay on the land at the time of the supposed purchase, as he purchased on a credit of one and two years. Land was depressed in price at the time, and no sales being made in the country. It is scarcely probable, under these circumstances, that such a man would have been selected for a *bona fide* purchaser of land, by one who, as is professed in the answer, was selling his land solely to realize means to pay his debts.

It is attempted to be shown that Ford paid these

notes, though perhaps, not at maturity, yet with reasonable promptness, notwithstanding the pendency of this litigation. This promptness to pay off the notes with his vendor insolvent, and a suit pending by which he was liable to lose the property, is not the reasonable conduct of a poor man, honestly investing all his hard-earned means in real estate. There certainly would have been some hesitancy in making the payments, and probably he would only have done so after consultation with counsel, and under his advice, if at all. Yet no such proof is made. Ford was elected a constable in March, 1866, we believe. Yet it is not probable that he should have made money enough by this office to have paid $2,500 in two years. And there is a total absence of evidence of the means of realizing it from other sources. What crops he made as a farmer, if any, are not shown nor attempted. Even if the office was a source of profit, neither he nor Howland could have anticipated his election to it in August, 1865, so as to have made it a basis of credit.

Another circumstance against the good faith of this conveyance is, that while they recite the money to have been paid, yet at the same time, an obligation seems to have been taken from Ford, recognizing the existence of the lien on the land. The obligation was never registered. Now if the transaction had been fair, and a lien to be retained, why not retain this lien on the face of the deed, and thus make it good against all the world until paid.

We .can see how the deed would serve all the better to keep off suspicion, and deter creditors from attacking it, by appearing to have been made for cash paid, but when the fact was otherwise, and a lien to be retained, we can see no reason why it should not have been put in the face of the deed.　Nor can we see any reason why it should not have been shown on the face of the deed that the land was sold on a credit, and notes given, when the parties were so careful to retain a lien in a separate instrument.　It would thus have made the notes all the better for use in the payment of Howland's debts, the ostensible object for making sale of the land.

As a last fact to which we refer on this question, it is proven that after the sale of the lands Howland went to one Miller, and proposed to let him have some of the notes received for the land. It seems. that he claimed that there was an old balance due Miller on a mule transaction, of some fifty or sixty dollars, perhaps, and he told Miller that if he would take the notes he would settle this balance. This was a matter of difference between them that Miller had no note for, and which he says he never expected to exact from Howland, as he had insisted Miller should make reparation to him for a mule purchased and taken South, which had proved defective in some way.　It is evident this was a debt which Howland had not hitherto been inclined to recognize; yet, in order to induce Miller to take the notes, he was now willing to settle it, poor· as he

was. He did not, it seems, propose to sell the notes to Miller, but to let him have them and take his receipt for them. Miller says he declined to do so, saying to Howland that he was in as many difficulties as he wanted, and would not involve himself in more. The reply indicates unmistakably what the character of the proposition was; that is, that Howland wished Miller to take the notes, give his receipt for them, and hold them for him—thus effectuating his purpose to conceal his effects from reach of creditors, as far as he could.

Without further discussion, or citation of numerous other facts tending to the same conclusion, we conclude we have presented enough to show that the Chancellor's decree was correct, and this deed a fraudulent device, to cover up the land from the reach of creditors.

As to the deed to Robert Howland, we need say but little more than that nearly all of the reasons given as to the Ford deed apply with equal force to this conveyance. In addition, he was the son, who might, without any feeling that he was doing wrong, very naturally conclude it was his duty to aid his father in saving his estate. The son was poor in 1865—had just returned, perhaps, from the war—had no means—is admitted, however, to have been industrious and energetic. Standing alone, it might have been difficult to pronounce the deed to him absolutely fraudulent, but being connected with the other transactions, of which it evidently forms a part, it is cer-

tain the son would be familiar with the purpose of the transactions, and no doubt participated in them, honestly believing it to . be his duty, probably; still the law makes no allowance for our generous motives, where the rights of third parties are to be affected by their operation.

We must in this case, too, affirm the decree of the Chancellor. The land will be sold by the Clerk of this Court, unless the money be paid in 60 days. Costs to be paid out of the fund arising from the sale.